UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA VIRGINIA

————————————————————— x

TEAMSTERS LOCAL 210 AFFILIATED            )          Civil Action No.
PENSION TRUST FUND, Individually and      )
on Behalf of All Others Similarly Situated,  )          CLASS ACTION
                                          )
                    Plaintiff,            )
                                          )
                                          )
        vs.                               )
                                          )
NEUSTAR, INC., LISA A. HOOK, JAMES        )
G. CULLEN, PAUL D. BALLEW, JOEL P.        )
FRIEDMAN, MARK N. GREENE, ROSS            )
K. IRELAND, PAUL A. LACOUTURE,            )
DEBORAH D. RIEMAN, MICHAEL J.             )
ROWNY, and HELLENE S. RUNTAGH,            )
                                          )
                    Defendants.           )          DEMAND FOR JURY TRIAL

————————————————————— x

**COMPLAINT FOR VIOLATIONS OF §§14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff Teamsters Local 210 Affiliated Pension Trust Fund ("Plaintiff"), for this complaint against Defendants (defined herein), alleges upon personal knowledge with respect to itself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action relates directly to the acquisition of NeuStar, Inc. ("NeuStar" or the "Company") by Golden Gate Private Equity, Inc. through its newly formed entities, Aerial Topco, L.P. ("Parent") and Parent's wholly-owned subsidiary Aerial Merger Sub, Inc. ("Merger Sub") (the "Transaction").

2.      The Transaction closed on August 8, 2017.

3.      On December 14, 2016, NeuStar entered into an agreement and plan of merger (the "Merger Agreement").  Per the terms of the Merger Agreement, stockholders of NeuStar would receive $33.50 per share in cash (the "Merger Consideration").  The terms of the Merger Agreement were approved by NeuStar's Board of Directors.

4.      On January 17, 2017, Defendants filed a Preliminary Proxy Statement with the U.S. Securities and Exchange Commission ("SEC") in connection with the Transaction, and on February 3, 2017, Defendants filed a Definitive Proxy Statement with the SEC in connection with the Transaction (the "Proxy").

5.      As detailed in this Complaint, the Proxy omits material information with respect to the Transaction, which renders the Proxy false and misleading.

6.      In addition, as detailed herein, the Proxy contains materially incomplete and misleading disclosures concerning the financial analyses performed by NeuStar's financial advisor, which also renders the Proxy false and misleading.

7.     The Merger Consideration paid to Plaintiff and the Class (defined herein) in the Transaction is unfair and inadequate as a result of the aforementioned omitted material information and the incomplete and misleading disclosures.

8.     Plaintiff alleges that Defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 14a-9 promulgated thereunder, in connection with the Proxy.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the Exchange Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

10.     This Court has jurisdiction over Defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the acts and conduct complained of herein occurred in substantial part in this District, and NeuStar's headquarters are located in this District.

## PARTIES

12.     As detailed in the certification filed herewith, which is incorporated herein by reference, Plaintiff was, at all relevant times, a holder of NeuStar common stock.

13.     Defendant NeuStar is a Delaware corporation and maintains its principal executive offices at 21575 Ridgetop Circle, Sterling, Virginia 20166.  Until August 8, 2017, NeuStar's common stock was traded on the New York Stock Exchange under the ticker symbol "NSR."

14.     Defendant Lisa A. Hook ("Hook") has been President of the Company since January 2008, Chief Executive Officer ("CEO") of the Company since October 2010, and a director of the Company since November 2010.  Following the Transaction, Hook remains NeuStar's President, CEO, and a director.

15.     Defendant James G. Cullen ("Cullen") was Chairman of the Board of Directors from 2010 through August 8, 2017, and a director of the Company from 2005 through August 8, 2017.

16.     Defendant Paul D. Ballew ("Ballew") was a director of the Company from July 2015 through August 8, 2017.

17.     Defendant Joel P. Friedman ("Friedman") was a director of the Company from 2006 through August 8, 2017.

18.     Defendant Mark N. Greene ("Greene") was a director of the Company from April 2012 through August 8, 2017.

19.     Defendant Ross K. Ireland ("Ireland") was a director of the Company from 2006 through August 8, 2017.

20.     Defendant Paul A. Lacouture ("Lacouture") was a director of the Company from 2007 through August 8, 2017.

21.     Defendant Deborah D. Rieman ("Rieman") was a director of the Company from July 2015 through August 8, 2017.

22.     Defendant Michael J. Rowny ("Rowny") was a director of the Company from 2006 through August 8, 2017.

23.     Defendant Hellene S. Runtagh ("Runtagh") was a director of the Company from 2006 through August 8, 2017.

24.     Defendants Hook, Cullen, Ballew, Friedman, Greene, Ireland, Lacouture, Rieman, Rowny, and Runtagh are collectively referred to herein as the "Board" or the "Individual Defendants." The Individual Defendants, along with NeuStar, are collectively referred to herein as "Defendants."

## OTHER RELEVANT ENTITIES

25.     Golden Gate Capital is private equity firm with over $15 billion of capital under management and is headquartered in San Francisco, California.

26.     Golden Gate Private Equity, Inc. ("Golden Gate") is a private equity group led by Golden Gate Capital.

27.     Parent is a Delaware limited partnership formed by Golden Gate and a party to the Merger Agreement.

28.     Merger Sub is a Delaware corporation, a wholly-owned subsidiary of Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

29.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all persons and entities that owned NeuStar common stock as of January 30, 2017, the record date for determination of stockholders entitled to notice of and to vote upon a proposal to adopt the Merger Agreement (the "Class"). Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

30.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

31.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained

through discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the Class. As of August 7, 2017, there were 55,965,415 shares of NeuStar Class A common stock issued and outstanding and 1,864 shares of Class B common stock outstanding.

32. All members of the Class may be identified from records maintained by NeuStar or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to those customarily used in securities class actions.

33. Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a) whether Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b) whether the Individual Defendants violated Section 20(a) of the Exchange Act; and

(c) whether Plaintiff and the other members of the Class suffered harm due to the consummation of the Transaction.

34. Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff has retained competent counsel experienced in litigation of this nature.

35. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

36.     Defendants have acted, or refused to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

37.     NeuStar is a technology company and global real-time information services provider. The Company was founded in 1996 and started as a business unit within Lockheed Martin Corporation.  NeuStar is currently the Local Number Portability Administrator ("LNPA") and manages the Number Portability Administration Center ("NPAC").  Number portability allows telephone customers to retain their phone number if they switch telephone service providers. NeuStar administers the largest Local Number Portability registry in the world, which facilitates the routing of over 4 billion calls and enables over 1 million transactions every day.  NeuStar is the only provider of such services under seven regional contracts (referred to in the Proxy as the "NPAC Contract") between NeuStar and North American Portability Management LLC (the "NAPM").

38.     In 2015, the Federal Communications Commission ("FCC") approved the selection of a NeuStar competitor, Ericsson subsidiary Telcordia Technologies Inc. ("Telcordia," doing business as "iconectiv"), to serve as the next LNPA and provide LNPA services in the United States.  Due to delays in transitioning the NPAC Contract to Telcordia, however, NeuStar still provides, and will continue to provide, services and transition services under the NPAC Contract at the current pricing terms until the NAPM provides at least one termination notice to NeuStar, which must establish a termination date that is 180 days after the date of notice.

39.     Once the transition of the LNPA services to Telcordia are completed, NeuStar expects to lose approximately $500 million of annual revenue, which, according to NeuStar, will adversely impact its income from operations and operating margin.  According to NeuStar, this loss may have

a disproportionate material negative impact on the Company's operating margin because of the largely fixed and shared cost structure that is designed to support all of its services.

40.      In addition to providing LNPA services, NeuStar offers a comprehensive suite of services to corporations in order to plan their media spend, identify and locate desired customers, invest effectively in marketing campaigns, deliver relevant offers, and measure the performance of these activities.   Security professionals also use the Company's solutions to maximize web performance and protect against malicious attacks.

**The Sale Process**

41.      On June 20, 2016, the Company engaged J.P. Morgan Securities LLC ("J.P. Morgan") as its financial advisor and the next day, the Company announced that it would separate NeuStar into two independent, publicly traded companies.

42.      Following that public announcement, according to the Proxy, NeuStar and J.P. Morgan received inquiries from six financial sponsors (referred to in the Proxy as Parties A, C, D, E, F, and G) and one strategic acquirer (referred to in the Proxy as Party B).

43.      According to the Proxy, in early July 2016, Parties A, B, and C had discussions with J.P. Morgan, resulting in those parties becoming a group (referred to in the Proxy as Group ABC). Group ABC subsequently sent an indication of interest to NeuStar with respect to a potential sale transaction, which did not include a proposed price or price range, but did indicate that the consideration would be a combination of cash and a contingent value right ("CVR") with respect to the NPAC Contract for a period of up to three years following the closing.

44.      According to the Proxy, on August 27, 2016, a member of the public equity arm of Golden Gate contacted defendant Hook indicating that Golden Gate was acquiring an equity position in NeuStar.

45.    According to the Proxy, on September 18, 2016, NeuStar's Board held a telephonic meeting at which members of NeuStar management and representatives of J.P. Morgan and Goodwin Procter LLP ("Goodwin"), NeuStar's outside counsel, were present.  At this meeting, among other things, defendant Hook informed the Board of her recent discussions with Golden Gate, and J.P. Morgan provided an update on the recent interactions with the other interested parties.

46.    According to the Proxy, the Board discussed with management the feasibility of certain assumptions being made by Group ABC with regard to the level of annual revenue and period during which NeuStar would continue to provide services under the NPAC Contract, and noted that NeuStar management estimated a transition date for the NPAC Contract of approximately September 30, 2018.

47.    According to the Proxy, NeuStar management's estimated transition date for the NPAC Contract of approximately September 30, 2018 was based on available information at that time.

48.    According to the Proxy, NeuStar management's estimated transition date for the NPAC Contract of approximately September 30, 2018 was also based on NeuStar management's judgment regarding potential delays in the transition process.

49.    NeuStar's management, however, was aware of, and had access to information regarding, delays associated with the transition process (as detailed below) that contradicted the September 30, 2018 estimated transition date for the NPAC Contract that was stated in the Proxy.

50.    According to the Proxy, on September 22, 2016, Golden Gate contacted J.P. Morgan to assess NeuStar's interest in a potential sale transaction with Golden Gate.

51.    According to the Proxy, in late September 2016, defendant Hook and NeuStar's Chief Financial Officer ("CFO") Paul S. Lalljie ("Lalljie") met with Golden Gate and certain other

interested parties to, among other things, present an overview of the Company, its products and technology, and a review of key financial highlights.

52.     According to the Proxy, on October 19, 2016, Golden Gate submitted a preliminary, non-binding proposal to acquire the Company for $33.50 per share.

53.     According to the Proxy, on November 9, 2016, J.P. Morgan provided a letter to the Board regarding potential conflicts of interest with Golden Gate and certain other interested parties. The letter indicated that J.P. Morgan and its affiliates had provided corporate finance, treasury and/or asset management services to each such party and/or its affiliates during the prior two years, including portfolio companies of Golden Gate.

54.     According to the Proxy, on November 29, 2016, after Party C withdrew from Group ABC, Party A submitted its own non-binding proposal to acquire the Company for $27.50 per share in cash payable at the closing and a CVR representing the right to receive a pro rata portion of the future net distributable cash flows generated by the NPAC business. Potential payments under the CVR would start on October 1, 2018 and continue for a period of up to four years following the closing. Party A estimated that the CVR could deliver additional value of up to $9.00 per share. The proposal also indicated that to the extent Party B were to participate, it would be a minority investor.

55.     According to the Proxy, on the same day, Golden Gate submitted a non-binding proposal to acquire the Company for $32.75 per share in cash, $0.75 per share lower than its October 19th proposal.

56.     According to the Proxy, on November 30, 2016, after the Board requested Golden Gate's best and final offer, Golden Gate submitted a proposal of $33.50 per share in cash.

57.    According to the Proxy, following a December 1, 2016 Board meeting, the Board concluded that the value of the CVR in Party A's proposal was significantly less than the $9.00 per share Party A indicated and therefore, the Board determined to continue negotiations with Golden Gate on a non-exclusive basis and informed Party A that it was not willing to engage in a transaction on Party A's proposed terms.

58.    According to the Proxy, on December 2, 2016, Party A submitted a revised proposal to acquire the Company for $28.50 per share in cash payable at the closing and a CVR with equivalent terms to those outlined in Party A's November 29th proposal.

59.    According to the Proxy, on December 4, 2016, NeuStar's Board held a telephonic meeting at which members of NeuStar management and representatives of J.P. Morgan and Goodwin were present.  At this meeting, the Board discussed the revised proposal received from Party A.  During these discussions, the Board noted NeuStar management's current expectation that transition services under the NPAC Contract would terminate around September 30, 2018. Thereafter, the Board informed Party A that the revised proposal remained unacceptable.

60.    According to the Proxy, on December 8, 2016, Party A submitted a further revised proposal to acquire the Company for $29.50 per share in cash payable at the closing and a CVR with equivalent terms to those outlined in Party A's November 29th proposal, except for an extension of the maturity date for the CVR from four years to five years following the closing.

61.    According to the Proxy, on December 11, 2016, NeuStar's Board held a telephonic meeting at which members of NeuStar management and representatives of J.P. Morgan and Goodwin were present.  At this meeting, the Board discussed the revised proposal received from Party A.  During these discussions, the Board noted NeuStar management's current expectation that

transition services under the NPAC Contract would terminate around September 30, 2018. Thereafter, the Board informed Party A that its further revised proposal remained unacceptable.

62.    According to the Proxy, on December 13, 2016, J.P. Morgan delivered its fairness opinion to the Board and the Board determined that the terms of the Merger Agreement were acceptable.

63.    According to the Proxy, in arriving at its opinion, J.P. Morgan relied on certain internal financial analyses and forecasts prepared by NeuStar management relating to NeuStar's business, which, among other things, used a September 30, 2018 termination date of the NPAC Contract.

64.    Specifically, according to the Proxy, J.P. Morgan calculated the net present value of the cash flows from the NPAC Contract for the period from June 30, 2017 to September 30, 2018, as provided in the Company management estimates.

65.    On December 14, 2016, prior to the opening of the U.S. stock markets, the parties executed the Merger Agreement.

66.    On March 14, 2017, NeuStar stockholders voted to approve the Merger Agreement.

67.    On August 8, 2017, NeuStar completed the Transaction with Merger Sub. NeuStar is the surviving corporation in the Transaction and, as a result of the Transaction, has become a wholly-owned subsidiary of Parent.

68.    Due to the Proxy's deficiencies identified herein, NeuStar stockholders were unable to cast an informed vote on the Transaction.

**NeuStar Knew the NPAC Contract Would Not Terminate by September 30, 2018**

69.    On November 18, 2016, in the midst of the sale process described above, NeuStar's legal counsel submitted a letter to the Secretary of the FCC (the "November 18th Letter") attaching the Number Portability Administration Center Transition Status Report (the "Transition Report"),

prepared by the information technology transition experts supporting NeuStar's Transition Project Management Office. NeuStar's Transition Report projected a transition completion date sharply at odds with the expected transition completion date of September 30, 2018 that was stated repeatedly in the Proxy.

70.    In the Transition Report, NeuStar expressed concern that completion of the LNPA transition would be seriously delayed, and that "[w]ithout significant changes to the current transition process, it is reasonable to conclude that the transition will not be completed until *sometime in 2019*."

71.    NeuStar explained in detail the basis for such delay. NeuStar described how it had become increasingly concerned with the failure of the NAPM and the Transition Oversight Manager ("TOM")[1] to share transition governance, risk, and schedule information. According to NeuStar, this concern was compounded by the failure of the NAPM's monthly transition reports to the FCC to provide a comprehensive and balanced assessment of the transition's status.

72.    NeuStar noted that, in August 2016, the TOM announced that the planned transition completion date was May 25, 2018. Due to the concerns raised in the Transition Report, however, NeuStar believed "a 2019 completion date appears more likely. Certainly without some fairly significant changes, *even 2019 might be optimistic*."

73.    On November 29, 2016, the NAPM responded to the November 18th Letter with its own submission to the FCC, stating, in pertinent part: "It is not reasonable for NeuStar to file a report concluding that the transition will not be completed until sometime in 2019 based on the fact

---

[1]    The FCC directed the NAPM to engage the TOM, an independent third party with communications infrastructure, project management, and change management experience, for the purpose of assisting the NAPM in overseeing the transition from the incumbent LNPA, NeuStar, to the incoming LNPA, Telcordia.

that NeuStar has not received certain information, particularly because NeuStar itself is solely to blame for its lack of access to that information."

74.    On December 2, 2016, NeuStar submitted another letter to the FCC defending the position it took in the November 18th Letter.[2]

**Other Interested Parties Accused NeuStar of Intentionally Delaying the Transition**

75.    Other interested parties accused NeuStar of intentionally delaying the transition of the NPAC Contract.

76.    In a joint letter to defendant Hook, the Chiefs of the FCC's Wireline Competition Bureau and Public Safety & Homeland Security Bureau noted their concern with delays to the LNPA transition caused in part by NeuStar's actions.

77.    In response, rather than reassure the FCC that it was taking its transition obligations seriously, NeuStar questioned the extent of its duty to cooperate.  Instead, NeuStar challenged the Bureaus' authority to oversee it during the transition.

78.    When the NAPM asked NeuStar whether it intended to release confidential information in order to prove its position that the NAPM's transition schedule is too optimistic, NeuStar refused to provide an answer.

79.     According to the NAPM, the refusal on the part of NeuStar was disturbing since NeuStar, as the incumbent LNPA, "has the natural incentive to disrupt or delay the transition."

80.    Concerns have been raised that the Transaction will further delay the LNPA transition.  The Chairperson of the Public Service Commission of the District of Columbia submitted a letter to the FCC regarding NeuStar's request to approve Golden Gate as the new owner of the

---

[2]    In submissions to the FCC, NeuStar raised an additional cause for the delay of the transition – Telcordia's impermissible use of foreign nationals to do computer coding on the NPAC system, which violated stipulations that only "vetted U.S. citizens" were to be involved.  As a result, Telcordia was required to start its software development from scratch.

LNPA, asserting that there is an appearance that there would be a financial benefit to the new ownership of NeuStar if the LNPA transition is not completed by the already-much-delayed transition date forecasted by the NAPM.  The Chairperson noted her understanding that there is no financial penalty or downside to NeuStar if the transition date slips again.  Indeed, Telcordia has noted that for every day of delay in the cutover to the new Telcordia system, NeuStar can continue to charge the industry approximately $1.4 million per day (not including the cost of transition services) that it would not collect if the Telcordia system went into production sooner.

**The Proxy Omitted Material Information, Rendering It False and Misleading**

81.    On February 3, 2017, following substantial review, editing and ultimate approval by the Board, Defendants filed the materially incomplete and misleading Proxy with the SEC and disseminated it to NeuStar's stockholders.

82.    The Proxy omits material information regarding the Transaction, which renders the Proxy materially false and misleading, in direct contravention of Sections 14(a) and 20(a) of the Exchange Act.

83.    Without this material information, NeuStar stockholders were unable to properly analyze the adequacy of the merger consideration and/or whether to vote in favor of the Transaction.

84.    Due to their joint preparation, editing, reviewing, approving, and/or disseminating the Proxy, Defendants knew, or were negligent in not knowing, that the Proxy omitted material information and was misleading, but failed to correct such misrepresentations.

85.    *First*, the Proxy omits material information regarding NeuStar management's expected date for the NPAC Contract to transition to Telcordia, which was provided to, and relied on, by the Board's financial advisor, J.P. Morgan, and which purportedly supports the fairness of the Merger Consideration being offered to stockholders.

86.    Specifically, although the Proxy stated that NeuStar management estimated a transition date for the NPAC Contract of approximately September 30, 2018, NeuStar contemporaneously informed the FCC that it did not expect the NPAC Contract to transition to Telcordia until 2019 or later.  The Proxy omitted any information that would allow a stockholder to know that the expected transition date stated in the Proxy was inconsistent with the expected transition date that NeuStar contemporaneously communicated to its federal regulator.

87.    This omission was material because the NPAC Contract, by NeuStar's own admission, generated a material level of annual revenue to NeuStar, and any extension of the time during which NeuStar would continue to provide services under the NPAC Contract would be substantially accretive to NeuStar's valuation.

88.    This omission also rendered J.P. Morgan's conclusion that the Merger Consideration was fair as materially misleading.

89.    The Proxy repeatedly stated that J.P. Morgan concluded the Merger Consideration was fair based on its valuation analyses, which in turn assumed that the NPAC Contract would terminate on September 30, 2018.  For example, the Proxy states:

> At the meeting of the Company's board of directors on December 13, 2016, J.P. Morgan rendered its oral opinion, subsequently confirmed in writing to the board, that, as of that date and on the basis of and subject to the various factors, assumptions and limitations set forth in such written opinion, the per share merger consideration was fair, from a financial point of view, to the holders of common stock.
>
> *       *       *
>
> In arriving at its opinion, J.P. Morgan, among other things: . . .
>
> reviewed certain internal financial analyses and forecasts prepared by the management of the Company relating to its business, which, among other things, assume that the NPAC Contract will terminate on September 30, 2018[.]

90.     The omission of NeuStar management's expectation that the NPAC Contract would not transition until 2019 or later also rendered the Board's recommendation that NeuStar stockholders vote in favor of the Transaction materially misleading.

91.     The Proxy stated that NeuStar retained J.P. Morgan as its financial advisor "for the purpose of advising the board of directors in connection with a possible spin-off or other transaction such as the merger and to evaluate whether the consideration in the merger was fair, from a financial point of view, to the holders of common stock."

92.     These statements were designed to convince stockholders to vote in favor of the Transaction and to illustrate that $33.50 was a fair price for NeuStar stockholders.

93.     However, both J.P. Morgan's determination that the Merger Consideration was fair and the Board's recommendation to stockholders to vote in favor of the Transaction were materially misleading because they were not based on financial analyses that incorporated NeuStar management's estimated date for the transition of the NPAC Contract of 2019 or later.  Rather, they were based on NeuStar management's purported estimated date for the transition of September 30, 2018.

94.     Additionally, NeuStar's financial projections of revenue, adjusted EBITDA, and unlevered free cash flow are materially misleading because the projections assumed that the Company would not provide services or transition services under the NPAC Contract after September 30, 2018, even though NeuStar told the FCC that it expected the transition to take place in 2019 or later.  The Proxy omitted the latter information.

95.     The aforementioned omitted facts are (and were) material in that they directly relate to the adequacy of the Merger Consideration that investors were offered in the Transaction.  Without disclosure of the aforementioned material information, management's purported estimated transition

date for the NPAC Contract of September 30, 2018, and the valuation analyses and financial projections that rely on it, were misleading and intellectually inaccessible. Defendants' omission of the aforementioned material facts renders the Proxy materially false and misleading, including: (1) all statements indicating that NeuStar management purportedly estimated a transition date for the NPAC Contract of approximately September 30, 2018; (2) the section entitled "Opinion of the Company's Financial Advisor"; (3) the section entitled "Recommendation of the Company's Board of Directors"; and (4) the section entitled "Projected Financial Information."

96.     *Second*, the Proxy's description of J.P. Morgan's opinion and valuation analyses fails to include key assumptions underlying the analyses. Without this information, as described below, NeuStar's public stockholders were unable to fully understand the analyses and, thus, were unable to determine what weight, if any, to place on the fairness opinion rendered in support of the Transaction.

97.     With respect to J.P. Morgan's Discounted Cash Flow Analysis, the Proxy fails to disclose J.P. Morgan's basis for preparing its discounted cash flow valuation as of June 30, 2017, even though its fairness analysis was prepared on December 13, 2016. J.P. Morgan's decision to move the valuation date more than six months into the future ignores the cash flows for the NPAC Contract during the first half of 2017, and artificially reduces J.P. Morgan's valuation of NeuStar. This information is (and was) material because the cash flows for the NPAC Contract, by NeuStar's own admission, are material to NeuStar, and without explaining why J.P. Morgan elected to set the valuation date as of June 30, 2017, the analysis is intellectually inaccessible. Defendants' omission of the aforementioned material information renders the Proxy materially false and misleading, including, but not limited to, the section entitled "Opinion of the Company's Financial Advisor."

98.    The above-referenced omitted information, if disclosed, would have significantly altered the total mix of information available to NeuStar's stockholders, and the omission of this material information renders the Proxy materially false and misleading.

### The Inadequate Merger Consideration and
### Interests of the Company's Officers, Directors and Financial Advisor

99.    The consideration paid to Plaintiff and the Class in the Transaction was unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Transaction as a result of Defendants' undervaluation of the future cash flows from the NPAC Contract.

100.    Based on NeuStar's own estimate that the NPAC Contract will be extended through the end of 2019, the implied valuation range for NeuStar common stock is likely upwards of $42.00 per share.  By contrast, the consideration paid to Plaintiff and the Class in the Transaction was $33.50 per share.

101.    Separately, J.P. Morgan also elected to prepare its discounted cash flow valuation as of June 30, 2017 even though its fairness analysis was prepared on December 13, 2016.  The decision to move the valuation date more than six months into the future creates another potential reduction in valuation by ignoring the cash flows for the NPAC Contract during the first half of 2017.

102.    Accordingly, the Transaction denied Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

103.    Meanwhile, certain of the Company's officers and directors received significant benefits as a result of the Transaction.

104.    For example, all of the officers of NeuStar immediately prior to the close of the Transaction continued as officers immediately following the close of the Transaction, including defendant Hook as CEO.

105.    In addition, Hook received a total of $28.9 million as a result of the Transaction, from the buyback of her common stock, options, and restricted stock units.  NeuStar CFO Lalljie received approximately $15 million as a result of the Transaction.  These payouts do not include cash payments or other consideration for the executives as part of the purchase agreement.

106.    Other executives receiving large payouts from their equity include: defendant Friedman, a NeuStar director, who received a $2.15 million payout in common stock and restricted stock; General Counsel Leonard Kennedy, who received $4.3 million in common stock and restricted stock buybacks; and Senior Vice President of Data Solutions Steve Edwards, who received $4.48 million through a mixture of common stock, options, and restricted stocks.

107.    The Board also entered into an engagement agreement with J.P. Morgan that strongly incentivized J.P. Morgan to render a positive fairness opinion and ensure the closing of the Transaction, as the vast majority of J.P. Morgan's fee was contingent on the closing of the Transaction.  In connection with the Transaction, the Company agreed to pay J.P. Morgan $23.4 million for its services; however, $19.9 million of this fee was contingent on the closing of an acquisition, and only $3.5 million was due and payable upon the delivery of J.P. Morgan's opinion.  Thus, 85% of J.P. Morgan's fee was contingent on the closing of the Transaction.

# CLAIMS FOR RELIEF

## COUNT I

### Claim for Violation of Section 14(a) of the Exchange Act and
### SEC Rule 14a-9 Promulgated Thereunder
### Against the Individual Defendants and NeuStar

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    In violation of Section 14(a) of the Exchange Act and Rule 14a-9, the Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.  NeuStar is liable as the issuer of these statements.

110.    The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware, or should have been aware, of the omitted material facts and of their duty to disclose the omitted material facts in the Proxy.

111.    The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

112.    The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy.

113.    The Proxy was an essential link in causing Plaintiff and the Company's stockholders to approve the Transaction.

114.    By reason of the foregoing, the Individual Defendants and NeuStar violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

115.    Because of the false and misleading statements in the Proxy, Plaintiff and the Class have suffered harm.

**COUNT II**

**Claim for Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

116.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117.    The Individual Defendants acted as controlling persons of NeuStar within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of NeuStar and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

118.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

119.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of the

Individual Defendants to approve the Transaction. Thus, they were directly involved in the making of the Proxy.

120.    By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the Exchange Act.

121.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, NeuStar's stockholders have been irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in its favor and in favor of the Class and against Defendants as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 12, 2017

/s/ Craig C. Reilly
Craig C. Reilly (VSB # 20942)
111 Oronoco Street
Alexandria, Virginia 22314
T: (703) 549-5354
F: (703) 549-5355
E: craig.reilly@ccreillylaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARIO ALBA JR.
MARK S. REICH
ALAN I. ELLMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
malba@rgrdlaw.com
mreich@rgrdlaw.com
aellman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
dwissbroecker@rgrdlaw.com

*Attorneys for Plaintiff*