IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| TEAMSTERS LOCAL 210 AFFILIATED PENSION TRUST FUND, *Individually and on Behalf of All Others Similarly Situated*, <br><br> Plaintiff, <br> v. <br><br> NEUSTAR, INC., *et al.*, <br><br> Defendants. | Civil Action No. 1-17-cv-1145 (AJT/JFA) |

## MEMORANDUM OPINION AND ORDER

In this securities class action brought pursuant to Sections 14(a) and 20(a) of the Securities Exchange Act of 1934, Plaintiffs allege that Defendants—Neustar, Inc. and members of its senior management—published a false and misleading statement in violation of Section 14(a) when a proxy solicitation stated an estimated date that proved incorrect with respect to when Neustar would transfer its duties as lead administrator of the Number Portability Administration Center ("NPAC") to another vendor, while not also disclosing information that raised concerns about the accuracy of that estimated date. Defendants have filed a Motion to Dismiss Amended Complaint [Doc. No. 32] (the "Motion") for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the Motion is GRANTED.

### I. BACKGROUND

Defendant Neustar is a government contractor that served as the Local Number Portability Administrator ("LNPA") pursuant to the Number Portability Administration Center Contract awarded to it by the Federal Communications Commission ("FCC") ("NPAC

Contract"). [Doc. 29 at ¶ 4]. As the LNPA, Neustar operated the Number Portability Administration Center, which allows telephone customers across the country to keep their phone numbers when they switch telephone service providers. *Id.* The NPAC Contract represented more than $500 million in revenue, more than half of Neustar's business income. *Id.* at ¶ 66. On March 26, 2015, the FCC decided to award the NPAC Contract to Telcordia instead of Neustar, with Neustar retaining administration of the NPAC during the transition from Neustar to Telcordia. *Id.* at ¶ 7.

In June 2016, Neustar hired J.P. Morgan as its financial advisor and announced that it would separate into two public companies. *Id.* at ¶ 67. Thereafter, seven potential suitors approached Neustar's senior management to discuss the possibility of a merger. *Id.* at ¶ 68. After receiving several offers, management chose to continue negotiations with the company known as Golden Gate, which had also approached management about the possibility of a sale transaction. Neustar Management's decision to proceed with Golden Gate was based largely on an evaluation of Golden Gate's offer in comparison to the other interested parties' offers in light of an estimated transition date for the NPAC Contract of September 30, 2018 and the calculations of Neustar's value based on that estimated date. *Id.* at ¶¶ 70–85. Group ABC, another potential acquirer, had sent an indication of interest stating that its offer would have included "a combination of cash and a contingent value right ("CVR") with respect to the NPAC Contract for a period of up to three years following the closing." *Id.* at ¶ 69. A CVR, which was not included in Golden Gate's offer, "is a derivative security or contract right that provides payments to holders upon the occurrence of specified contingencies." *Id.*

On December 13, 2016, J.P. Morgan delivered its fairness opinion on Golden Gate's offer to the Board, which approved the offer and executed the Merger Agreement. *Id.* at ¶ 93.

J.P. Morgan's fairness opinion, which was essential to the Board's decision to approve the Merger Agreement, "relied on certain internal financial analyses and forecasts prepared by Neustar management," including a calculated net present value of the cash flows from the NPAC Contract, which in turn relied on the assumption that the transition of the NPAC Contract to Telcordia would occur on or around the estimated transition date of September 30, 2018. *Id.* at ¶¶ 94–95.

Following Board approval, Neustar's management then presented the merger to the company's shareholders, who approved the Merger Agreement on March 14, 2017. *Id.* at ¶ 97. On February 3, 2017, before the shareholder vote, the Board issued a Proxy Statement to the shareholders. *Id.* at ¶ 124. The Proxy Statement referenced repeatedly the estimated transition date of September 30, 2018 and its importance in management's ultimate decision to accept Golden Gate's merger proposal. Specifically, it stated:

> On December 4, 2016, our board held a telephonic meeting at which members of management and representatives of J.P. Morgan and Goodwin were present. At this meeting, the board discussed the revised proposal received from Party A, noting that, while Party A had increased the closing cash payment to $28.50 per share, Party A had not made any changes to increase the potential value of the CVR component of the consideration. The board also discussed potential payout scenarios for the CVR with J.P. Morgan on a risk-adjusted basis and taking into account management's estimates of future cash flows generated by the NPAC business and the time value of money. The board noted that, based on J.P. Morgan's analysis, one would have to assume a 63% probability of receiving the full CVR payments for an extended period from October 1, 2018 to June 30, 2021, to equal the $33.50 proposal made by Golden Gate and GIC SI. *Based on these discussions, and considering management's current expectation of transition services under the NPAC Contract terminating around September 30, 2018*, the CVR period not commencing until October 1, 2018, and the uncertainty surrounding our ongoing litigation regarding the FCC order at that time, the board concluded that the certainty of stockholder value of the proposal submitted by Golden Gate and GIC SI continued to be superior to Party A's revised proposal.

[Doc. 34-1 at 41 (emphasis added)]. The Proxy Statement repeated this estimated transition date of September 30, 2018 on several other occasions and informed shareholders that J.P. Morgan

3

developed its fairness analysis based in part on the September 30, 2018 estimated transition date. *See, e.g., id.* at 35, 39, 41, 42, 47, 50, 52, 56. The Proxy Statement also included the following cautionary language with respect to the estimated transition date:

> [D]ue to the uncertainty surrounding the duration of the NPAC Contract, the financial projections do not include any amounts that we may receive for providing services or transition services under the NPAC Contract after September 30, 2018. There can be no assurance that the financial results in the financial projections will be realized, or that future actual financial results will not materially vary from those estimated in the financial projections.

*Id.* at 55. The Proxy Statement elsewhere indicated that the referenced estimates could be materially affected by, among other things, "uncertainty regarding the amount of time that we will serve as the Local Number Portability Administrator and the outcome of our ongoing litigation with the FCC regarding the process by which the NPAC Contract was awarded to a competitor of the Company." [Doc. 34-1 at 18, 24].

Between the issuance of the Proxy Statement and the shareholders' vote to approve the Merger Agreement, Neustar's outside legal counsel sent a report to the FCC called the Number Portability Administration Center Transition Status Report ("the Transition Report"), which was designed to apprise the FCC of the current status of the NPAC transition. [Doc. 29 at ¶ 100]. The Report was authored by three Information Technology specialists who reported to Neustar's Chief Financial Officer. *Id.* at ¶¶ 100, 105. Based on the claimed failure of the NAPM and the Transition Oversight Manager to share transition governance, risk, and schedule information, the authors expressed concerns with the May 2018 estimated transition date developed by the Transition Oversight Manager, an independent third party appointed by the FCC. Specifically, the Report warned that "[w]ithout significant changes to the current transition process, it [was] reasonable to conclude that the transition w[ould] not be completed until sometime in 2019." *Id.* at ¶ 101 (emphasis omitted)]. Based on the various problems the Report identified, its authors

4

estimated that "a 2019 completion date appear[ed] more likely" than the May 2018 date, and that "without some fairly significant changes, even 2019 might be optimistic." *Id.* at ¶ 104.

After receiving the Report, the Transition Oversight Manager, acting through NAPM (the organization that hired the Transition Oversight Manager), responded by accusing Neustar of being solely at fault for any potential delays in the transition date. *Id.* at ¶¶ 106–07. After Neustar continued to communicate its concerns about the status of the transition, the transition date was in fact delayed significantly, and others blamed these delays on Neustar's mismanagement, or perhaps even intentional hesitation, in managing the transition. *See id.* at ¶¶ 111–23. Despite relaying to shareholders the estimated transition date of September 30, 2018, which was four months later than the Transition Oversight Manager's target transition date of May 25, 2018, the Proxy Statement did not contain any reference to the Transition Report and the warnings contained within it.

The Neustar shareholders approved the merger on March 14, 2017. *Id.* at ¶ 97. On October 10, 2017, Plaintiffs filed this action and on January 19, 2018, filed an Amended Complaint. On February 2, 2018, Defendants filed the Motion.

Plaintiffs contend that because material information was withheld from shareholders concerning the estimated transition date of September 30, 2018, shareholders approved the sale of the corporation to Golden Gate, at management's recommendation, based on a significantly undervalued price, which did not take into account the continued revenues Neustar would realize from the NPAC Contract as a result of the greatly delayed transition date.[1] *Id.* at ¶ 143. More specifically, Plaintiffs contend that the lack of any reference in the Proxy Statement to the

---

[1] As of the hearing on the Motion, held on April 18, 2018, the transition had not yet occurred. The record does not indicate whether the transition has occurred since that hearing and, if so, when.

5

Transition Report and the warnings contained in it made materially misleading: (1) J.P. Morgan's conclusion that the Merger Consideration was fair; (2) the Board's recommendation that the corporation's shareholders vote for the Transaction; (3) the Board's rejection of competing proposals to Golden Gate's that would have turned out more favorable to shareholders in light of the later transition date (particularly the proposal including a CVR associated with the NPAC Contract); and (4) Neustar's future revenue projections, adjusted EBITDA, and unlevered free cash flow. *Id.* at ¶¶ 136–38. According to Plaintiffs, these misleading statements violated Sections 14(a) and 20(a). *Id.* at 36–37.

## II. LEGAL STANDARD

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *See Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994); *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1994). A claim should be dismissed "if, after accepting all well-pleaded allegations in the plaintiff's complaint as true . . . it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *see also Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001). In considering a motion to dismiss, "the material allegations of the complaint are taken as admitted," *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969) (citations omitted), and the court may consider exhibits attached to the complaint, *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F. 2d 1462, 1465 (4th Cir. 1991).

Moreover, "the complaint is to be liberally construed in favor of plaintiff." *Id.*; *see also Bd. of Trs. v. Sullivant Ave. Props., LLC*, 508 F. Supp. 2d 473, 475 (E.D. Va. 2007). In addition, a motion to dismiss must be assessed in light of Rule 8's liberal pleading standards, which require only "a short and plain statement of the claim showing that the pleader is entitled to

relief." Fed. R. Civ. P. 8. Nevertheless, while Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (the complaint "must be enough to raise a right to relief above the speculative level" to one that is "plausible on its face"); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). As the Supreme Court stated in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008), "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw a reasonable inference that the defendant is liable for the conduct alleged."

The sufficiency of the Complaint is also to be assessed under the requirements of the Private Securities Litigation Reform Act, which provides that to state a claim for money damages under § 14(a), a class action complaint "shall, with respect to each act or omission alleged[,] . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Determining whether an inference is strong requires "weigh[ing] [the inference] against the opposing inferences that may be drawn from the facts in their entirety." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 624 (4th Cir. 2008). The inferences of a particular state of mind must be "at least as compelling as any opposing innocent inference." *Yates v. Mun. Morg. & Equity LLC*, 744 F.3d 874, 885 (4th Cir. 2014).

### III. ANALYSIS

According to Plaintiffs, Defendants' omission of the Transition Report from the Proxy Statement was materially misleading because it failed to apprise the shareholders of the true state of the transition, thereby essentially inducing the shareholders to approve the merger with Golden Gate at an undervalued price given that Neustar would ultimately realize considerable

additional revenue from the extension of the NPAC Contract past the estimated transition date (and thereby causing Neustar's value to be much higher than that which was assumed in J.P. Morgan's evaluation of the fairness of Golden Gate's offer). [Doc. 29 at ¶ 130].

Under Section 14(a) of the Exchange Act, it is unlawful for any person "to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security" in violation of rules and regulations as the Commission may prescribe. 15 U.S.C. § 78n(a)(1). "Pursuant to this prohibition, Rule 14a–9 provides that '"no solicitation . . . shall be made by means of any proxy statement . . . containing any statement which, . . . is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."'" *Knurr v. Orbital ATK Inc.*, 276 F. Supp. 3d 527, 535 (E.D. Va. 2017) (quoting 17 C.F.R. § 240.14a-9(a)). Hence, in order to plead a § 14(a) claim, plaintiffs must allege and prove: '"(1) the proxy statement contained a material misrepresentation or omission (2) that caused the plaintiff injury and that (3) the proxy solicitation was an essential link in the accomplishment of the transaction.'" *Knurr*, 276 F. Supp. 3d at 535 (quoting *Hayes v. Crown Centr. Petrol. Corp.*, 78 Fed. Appx. 857, 861 (4th Cir. 2003) (per curiam) (unpublished)).

The September 30, 2018 estimated transition date was an opinion that purportedly represented management's working assumption as to the timeline of the transition. "A reasonable investor does not expect that every fact known to [a speaker] supports its opinion statement" and understands that "opinions sometimes rest on a weighing of competing facts." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 (2015). Indeed, "the presence of such facts is one reason why [the speaker] may frame a statement as an opinion, thus conveying uncertainty." *Id.* Therefore, "[a]n opinion statement . . .

8

is not necessarily misleading when [the speaker] knows, but fails to disclose, some fact cutting the other way." *Id.* In the Fourth Circuit, to plead that an opinion is a false factual statement in a securities fraud case, a plaintiff must "allege that the opinion expressed was different from the opinion actually held by the speaker." *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004).[2] Under this standard, an omission of facts can render an opinion statement false, but in order to do so, the omitted fact must create a strong inference that the speaker could not have reasonably held the opinion they published. "The core inquiry is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (quoting *Omnicare*, 135 S. Ct. at 1329).

Plaintiffs have failed to allege facts that create a strong inference that at the time they issued the Proxy Statement, the Defendants could not have reasonably held the opinion that a transition would occur by September 30, 2018. The only facts alleged in the Complaint that arguably support this contention is the Transition Report, which warned that the transition might not occur by the May 25, 2018 transition completion target set by the Transition Oversight Manager "[w]ithout significant changes to the current transition process," and that without such changes, it would be "reasonable to conclude that the transition w[ould] not be completed until sometime in 2019" or even later. [Doc. 29 at ¶¶ 101, 104]. These statements were far from

---

[2] In *Nolte*, the Fourth Circuit set forth the test for actionability of an opinion as a false statement in a claim under Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934. 390 F.3d at 313. However, both provisions use closely similar language. *Compare* 17 C.F.R. § 240.10b-5(b) (promulgated pursuant to Section 10(b)) ("It shall be unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .") *with* 17 C.F.R. § 240.14a-9(a) (promulgated pursuant to Section 14(a)) ("No solicitation subject to this regulation shall be made by means of any proxy statement . . . containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading . . . ."). *See also Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 570 (1995) ("[T]he normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning." (internal quotation marks omitted)); *Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("[A] legislative body generally uses a particular word with a consistent meaning in a given context.").

9

definitive pronouncements that the transition date would occur later than September 2018. It was a report, based admittedly on incomplete information held by its writers, that cautioned that the transition date could occur much later than current projections if corrective steps were not taken. *See* [Doc. 34-3 at 2 ("In working with Neustar, Inc. and other key stakeholders in the Number Portability Administration Center (NPAC) transition during the past sixteen months, we have become increasingly concerned with the failure of the North American Portability Management LLC (NAPM) and the Transition Oversight Manager (TOM) to share transition governance, risk, and schedule information. The failure to share this information has the potential to significantly delay project completion. Although the requisite transition planning documents may exist, they have not, to date, been shared with Neustar.")].

Indeed, the estimated transition date of September 30, 2018 reported by Defendants was four months later than the Transition Oversight Manager's completion target of May 25, 2018, which suggests that Defendants took the NPACTS Report and other information into consideration in developing an estimated transition date considerably less optimistic than the Transition Oversight Manager's target date. Further, Defendants included in the Proxy Statement disclosures that would have put a reasonable investor on notice that the estimated transition date was far from certain in Defendants' minds. Defendants disclosed that Neustar was challenging the FCC's order approving the selection of Telcordia to assume responsibility for the contract. [Doc. 34-1 at 18, 24 ("We believe the FCC order approving the North American Numbering Council's selection of this competitor as the next LNPA violates the notice and comment rulemaking requirements of the Administrative Procedure Act, violates the FCC's rules by selecting an entity that is not impartial or neutral to serve as the next LNPA, and is arbitrary, capricious, an abuse of discretion or otherwise contrary to law. On April 6, 2015, we filed a

Petition for Review asking the U.S. Court of Appeals for the District of Columbia Circuit to hold unlawful, vacate, enjoin, and set aside the FCC order. Oral argument before the Court of Appeals took place in September 2016.")]. Defendants also made clear that there was "uncertainty regarding the amount of time that [Neustar] will serve as the [LNPA]." *Id.* at 18. Within the full context presented by the Proxy Statement, the omission of the Transition Report does not, standing alone, give rise to the strong inference that Defendants did not believe, or could not have reasonably believed, that a transition would occur by September 30, 2018, or that the shareholders were not adequately warned concerning the risk that a transition would not occur by September 30, 2018. Plaintiffs have therefore failed to state a claim under Section 14(a) that a proxy statement contained a false and misleading statement.

Because the Court finds that Plaintiffs have failed to state a claim against Defendants for violating Section 14(a), Plaintiffs' control-person liability claim under Section 20(a) also fails. *See, e.g., Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 192 (4th Cir. 2009) ("Because the complaint fails to withstand a Rule 12(b)(6) motion with respect to the predicate violation . . . it also fails with respect to the § 20(a) claims.").

## IV. CONCLUSION

Accordingly, it is hereby

ORDERED that Defendants' Motion to Dismiss Amended Complaint [Doc. No. 32] be, and the same hereby is, GRANTED; and this action is DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
February 19, 2019

11